**UNITED STATES of America,
Appellant,**

**v.**

**Robert BYE and Kent Bulger,
Defendants,**

**Kent Bulger, Defendant–Appellee.**

**No. 1914, Docket 90–1373.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 13, 1990.

Decided Nov. 16, 1990.

Paul G. Gardephe, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Deborah Landis, Asst. U.S. Atty., Helen Gredd, Asst. U.S. Atty., of counsel), for appellant.

Susan G. Kellman, New York City, for defendant-appellee.

Before MINER and ALTIMARI, Circuit Judges, and KELLEHER, Senior District Judge.*

ALTIMARI, Circuit Judge:

The central issue on this appeal is whether the district court erred in granting defendant-appellee Kent Bulger's motion to suppress. The United States, appealing pursuant to 18 U.S.C. § 3731 (1988), argues that the district court misapplied the legal standard for determining whether the defendant voluntarily waived his right to remain silent and voluntarily consented to a search of his apartment. For the reasons set forth below, we vacate the district court's order and remand for further proceedings.

## BACKGROUND

On October 31, 1989, at approximately 4:00 p.m., defendant-appellee Kent Bulger was arrested by two New York City Police detectives acting pursuant to a federal complaint. The complaint charged Bulger with one count of conspiracy to distribute heroin, in violation of 21 U.S.C. § 846 (1988), and nine counts of distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and (C) (1988). The complaint further alleged that Bulger had sold heroin to an undercover officer on nine separate occasions, and that the heroin sold on five of those occasions had been supplied to him by co-defendant Robert Bye, a/k/a "Nuggie." Shortly after his arrest, Bulger was advised of his *Miranda* rights and was escorted to the 30th Precinct in upper Manhattan.

At approximately 4:30 p.m., Federal Bureau of Investigation ("FBI") Special Agents Dennis K. Tanner and David Higgins took custody of Bulger, and drove him to FBI headquarters in lower Manhattan. In the car, Bulger was again advised of his *Miranda* rights. Agent Tanner also apprised Bulger of what was going to occur over the course of the next several hours and days. Specifically, Tanner explained that upon arrival at FBI headquarters Bulger—if willing—would be questioned.

Tanner informed Bulger that, because a magistrate was not available that evening, he would spend the night at the Metropolitan Correctional Center. In the morning, after an interview with Pretrial Services and processing by the U.S. Marshal's Office, Bulger would be brought to court for his initial appearance before a magistrate. Further, Tanner indicated that Bulger would either be given an opportunity to consult with his attorney or, if he could not afford an attorney, one would be appointed for him.

Tanner then shifted his discussion to the narcotics charges against Bulger, explaining that the drug transactions could be divided into two categories. First, there were the transactions that occurred prior to the date that the federal sentencing guidelines went into effect. According to Tanner, those transactions—of which there were seven—carried a possible penalty of 15 years each. Second, there were the transactions which occurred after the guidelines had gone into effect. According to Tanner, penalties for those transactions would be computed in accordance with the sentencing guidelines, *i.e.*, the sentences would be calculated based on the quantity of narcotics sold. Tanner also advised Bulger that, if a defendant cooperates, a judge is permitted to impose a lesser sentence than otherwise required under the guidelines. Tanner informed Bulger that he was unaware of the length of the sentence Bulger faced on the guideline counts. Finally, Tanner advised Bulger that his cooperation would be welcomed and that it would be more beneficial to him if he cooperates early in the investigation.

Upon their arrival at FBI headquarters, Agents Tanner and Higgins took Bulger to the offices of the Organized Crime Drug Enforcement Task Force. Bulger was placed in a conference room and was again informed of his *Miranda* rights. This time, however, the agents emphasized that if Bulger chose to talk to the agents he had the right to discontinue the conversation at

---

* The Honorable Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation.

any time. Tanner then provided Bulger with an advice of rights form. The form lists the *Miranda* rights and also contains a statement waiving those rights. The waiver reads:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Bulger initialed the waiver; Higgins and Tanner signed as witnesses.

At approximately 5:48 p.m., Agent Tanner began questioning Bulger. Tanner first asked about the heroin Bulger was charged with selling. Bulger initially stated that the heroin was supplied by someone other than Bulger's co-defendant Bye. When Tanner specifically asked about Bye, Bulger said he did not know anyone by that name. When asked if he knew "Nuggie"—Bye's nickname—Bulger indicated that he knew Nuggie but was unwilling to answer questions about him without a lawyer present. However, Bulger did express his willingness to continue answering questions about other individuals and activities without a lawyer present. Eventually, the conversation turned to Bulger's own narcotics trafficking. Bulger informed the agents that he had sold small amounts of cocaine over the previous six months, and that a small amount of cocaine, "cut" (a substance used to dilute narcotics) and a gun were currently in his apartment. Agent Higgins then asked Bulger if he would consent to a search of his apartment. Bulger agreed and signed a consent to search form. At the time Bulger signed the form, the interview had been in progress for approximately two hours.

Agent Higgins and several other law enforcement officers then went to Bulger's apartment and conducted a search. The agents discovered cocaine, narcotics paraphernalia, a .38 caliber revolver and ammunition.

On November 14, 1989, a thirteen count indictment was filed against Bulger. In addition to the ten counts charged in the complaint, the indictment further charged Bulger with possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), maintaining his apartment for the purpose of unlawfully manufacturing and distributing cocaine, in violation of 21 U.S.C. § 856 (1988), and use of a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (1988).

In district court, Bulger moved to suppress both his post-arrest statements and the physical evidence obtained from his apartment as a result of the search. Specifically, Bulger argued that his statements and consent were obtained as a result of unduly coercive conduct by the agents and thus violated his fourth and fifth amendment rights. A suppression hearing was held at which Agent Tanner and Bulger testified at length. The court also entertained extensive oral argument by counsel. Ultimately, the court fully credited Tanner's testimony; Bulger's version of the relevant facts was apparently rejected. *See United States v. Bye*, 89 CR. 860, at 1-2 (CSH), 1990 WL 64546 (S.D.N.Y. May 8, 1990). Nevertheless, the court found that Bulger's statements and his consent to search his apartment were the product of unduly coercive police conduct. As a result, the district court ordered suppression.

## DISCUSSION

On this appeal, the United States argues that the district court failed to properly consider whether Bulger's post-arrest statements and consent to search his apartment were voluntarily given. The government contends that in considering these issues the district court did not examine the totality of the circumstances and, instead, applied a *per se* prohibition against mentioning the possible sentence facing a defendant and the potential benefits of his cooperation. We agree.

In assessing the voluntariness of a defendant's waiver of his right to remain silent and a defendant's consent to search

his apartment, the proper test is whether the waiver and the consent were "the product of an essentially free and unconstrained choice by [their] maker." *United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir.1988) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973)); *see United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990). When engaging in this inquiry, a reviewing court must consider "the totality of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047; *see Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986); *United States v. Kon Yu–Leung*, 910 F.2d 33, 41 (2d Cir.1990). Accordingly, this Court has steadfastly avoided the adoption of any criterion that, in and of itself, would mandate a finding of involuntariness and thereby undermine a thorough analysis of all the relevant circumstances. *See, e.g., Kon Yu–Leung*, 910 F.2d at 41; *Arango–Correa*, 851 F.2d at 57–58; *United States v. Puglisi*, 790 F.2d 240, 243–44 (2d Cir.) (per curiam), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986).

■ In the present case, rather than engaging in the required comprehensive inquiry, the district court appears to have fixed its analysis almost exclusively on Agent Tanner's comments regarding the potential sentence facing Bulger and the purported benefits of early cooperation. Based on these arguably imprudent comments, the court concluded that Bulger's consent to search and his post-arrest statements were not voluntarily obtained. In reaching this conclusion, the district court relied on *United States v. Duvall*, 537 F.2d 15 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). In *Duvall*, this Court expressed concern over an Assistant United States Attorney's ("AUSA") statement to a defendant that the charges against him carried "a possible sentence of a hundred years." *Id.* at 25. A close analysis of *Duvall*, however, demonstrates that the AUSA's statement was but one factor of many which led to a finding of coercion. Indeed, this court

went to great lengths to describe the particular circumstances in *Duvall* which warranted suppression:

> A defendant, arrested with considerable force on one day, interrogated and processed for the balance of that day, jailed for the night, returned to his interrogators for the trip to arraignment before a magistrate, suddenly finds himself closeted with an Assistant U.S. Attorney who, unbeknown to the defendant, had drawn up a complaint against him before his arrest and was about to go before a magistrate to begin the prosecution. Unarraigned and uncounselled for 20 hours, the defendant is taken through the questions answered the previous day, this time with a warning from the prosecutor that, if the case goes to trial, he can be sentenced to 100 years in prison.

*Duvall*, 537 F.2d at 24 (footnote omitted). Certainly, the finding of coercion in *Duvall* was based on more than the prosecutor's misguided comment on the defendant's possible sentence.

Moreover, numerous decisions of this Court expressly demonstrate that the type of comment made by the AUSA in *Duvall* and by Agent Tanner in this case will not—without more—require suppression. For example, in *United States v. Guarno*, 819 F.2d 28 (2d Cir.1987), we stated that "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." *Id.* at 31. Similarly, in *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990), we held that law enforcement agents "[are] free to discuss with [a defendant] the evidence against him and the reasons why he should cooperate." *Id.* at 1138. Further, in *United States v. Pomares*, 499 F.2d 1220 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974), we found nothing improper about a defendant being told by federal agents that he faced "heavy penalties" and "that the wisest course of action would be to cooperate with the government." *Id.* at 1221, 1222. Thus, we are unconvinced that the mere mention of

**10**

the possible sentence facing a defendant and the benefits to be derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience.

To summarize, our review of the record indicates that the district court improperly utilized a *per se* approach in finding that Bulger's post-arrest statements and consent to search his apartment were the product of undue coercion. Thus, the court failed to fully assess the totality of the circumstances as required. Although an evaluation of the facts developed thus far suggests that the government has adequately demonstrated that Bulger's waiver of *Miranda* and his consent to search were freely given, it is apparent that the district court has not yet made full factual findings or resolved all the relevant factual disputes. Accordingly, we believe it is appropriate to vacate the district court's order and remand for further proceedings on this matter.

CONCLUSION

Based on the foregoing, the order of the district court is vacated and the case is remanded for further proceedings not inconsistent with this opinion.